# EXHIBIT A

**Golden Gate University School of Law**
**Digital Commons: The Legal Scholarship Repository @ Golden Gate University School of Law**

California Assembly                                      California Documents

8-28-1989

# Televising the Legislature: Serving Democracy in an Electronic Age

Assembly Committee on Utilities and Commerce

Follow this and additional works at: http://digitalcommons.law.ggu.edu/caldocs_assembly

 Part of the Legislation Commons

Recommended Citation

Assembly Committee on Utilities and Commerce, "Televising the Legislature: Serving Democracy in an Electronic Age" (1989).
*California Assembly.* Paper 306.
http://digitalcommons.law.ggu.edu/caldocs_assembly/306

This Hearing is brought to you for free and open access by the California Documents at Digital Commons: The Legal Scholarship Repository @
Golden Gate University School of Law. It has been accepted for inclusion in California Assembly by an authorized administrator of Digital Commons:
The Legal Scholarship Repository @ Golden Gate University School of Law. For more information, please contact jfischer@ggu.edu.

Informational   Hearing
of  the
Assembly  Committee  on  Utilities  and  Commerce

# "TELEVISING THE LEGISLATURE:
## Serving  Democracy  in  an  Electronic  Age



DEPOSITORY

OCT 1 6 1989

RECEIVED

ASSEMBLYWOMAN GWEN MOORE
Robert  Jacobson,  Committee  Consultant
Yvonne  Wilson,  Committee  Secretary
Hallie  Mays,  Committee  Assistant

KFC
22
L500
U84
1989
no. 8

0284-A

KFC
25
L500
U84
1989
no. 8

MEMBERS

Jerry Eaves
Bob Epple
Frank Hill
Lucy Killea
Ted Lempert
Willard Murray
Pat Nolan
Lucille Roybal-Allard
Cathie Wright
Vacancy

STAFF

William Julian
Principal Consultant

Robert Jacobson
Principal Consultant

Carolyn Veal
Principal Consultant

Yvonne Wilson
Committee Secretary

State Capitol
P. O. Box 942849
Sacramento, California
94249-0001
(916) 445-4246

# California Legislature

## Assembly Committee

## on

## Utilities and Commerce

### GWEN MOORE
CHAIRWOMAN
MEMBER OF THE ASSEMBLY
FORTY-NINTH DISTRICT

Informational Hearing
August 28, 1989, 1:30 PM
State Capitol, Room 447

### *TELEVISING THE LEGISLATURE: Serving Democracy in an Electronic Age*

LAW LIBRARY

OCT 3 1 1989

GOLDEN GATE UNIVERSITY



## Agenda

I.  Opening Remarks:  Honorable Gwen Moore, Chairwoman
II. Testimony

## Witnesses

Mr. Edward Allen
Board of Directors
C-SPAN

Mr. Warren Olney
Co-Author
KCOP-TV

Mr. Joe Camicia
KQED-TV
Public Broadcasting Station

Ms. Evelyn Pine
Foundation for Community Service
Cable Television

Professor Tracy Westin
Annenberg School
of Communications

Dr. Robert Main
California Technology Project
Cal State University, Chico

Mr. Paul Koplin
Executive Director
California Channel

Dr. Barbara O'Connor
Dept. of Communications
Cal State University, Sacramento

Mr. Dennis Mangers
Acting Executive Director
California Cable Television Association

Professor Dan Brenner
Director, Comm. Law Program
UCLA School of Law

Mr. Steven Mallory
President
Northern California News Satellite

Mr. Vic Biondi
Executive Director
California Broadcasters Assn.

MEMBERS

William Bradley
Jerry Eaves
Bob Epple
Nolan Frizzelle
Frank Hill
Lucy Killea
Ted Lempert
Willard Murray
Pat Nolan
Richard Polanco
Lucille Roybal-Allard
Cathie Wright

STAFF

William Julian
Principal Consultant

Robert Jacobson
Principal Consultant

Carolyn Veal
Principal Consultant

Yvonne Wilson
Committee Secretary

State Capitol
P.O. Box 942849
Sacramento, California
94249-0001
(916) 445-4246

# California Legislature

## Assembly Committee

### on

## Utilities and Commerce

### GWEN MOORE
CHAIRWOMAN
MEMBER OF THE ASSEMBLY
FORTY-NINTH DISTRICT

Informational Hearing
August 28, 1989, 1:30 PM
State Capitol, Room 447



## TELEVISING THE LEGISLATURE:
### Serving Democracy in an Electronic Age

### Introduction

In California, citizens can watch television news that covers every
level of government, with one exception. That exception is state govern-
ment and, in particular, the Legislature. The federal Congress and
Administration are covered via popular broadcast and cable channels.
Local government is covered by local cable programming. Education has
its own broadcasting systems. But the Legislature remains largely unseen
and unsung by the majority of Californians.

According to recent opinion polls, more than 70 percent of all
Americans get most of their news from broadcast and cable television.
Television's growing influence on the political process has been commented
on by nearly everyone involved on one side of the TV camera or the other.
Yet, in California, there is no regular television coverage of state govern-
ment generally or the Legislature specifically. Ironically, in an age when
fewer Californians than ever read newspapers or serious magazines, the

iii

state's citizens are dependent for their state public affairs news on the newspaper and magazine reporters who comprise the capital press corps.

This hearing examines the prospects for television coverage of state government, with a special focus on the Legislature.

Television Coverage of Congress:
· The C-SPAN Experience

At the federal level, Congress has recognized the importance of the television medium by opening its proceedings to C-SPAN, the "Cable Satellite Public Affairs Network."  C-SPAN, an independent, non-partisan and nonprofit corporation, provides Congress with access to hundreds of cable television systems throughout the United States.  The House of Representatives began to transmit its proceedings via C-SPAN in 1979; the Senate followed in 1986.  By 1988, nearly 22 million Americans -- an increase of 100 percent in four years -- regularly watched C-SPAN, with dedicated viewers (12 percent of the audience) watching over 20 hours of programming each month.  C-SPAN viewers vote at nearly twice the rate of non-viewers.

C-SPAN, which now has an annual budget of over $12 million and a staff of 140, provides over 3,200 cable systems with live video feeds from Congress and contextual programs (interviews, reports on general issues, regional public affairs stories, and so forth).  C-SPAN arranges for the complete "package" to be transmitted by satellite to participating cable television stations.  Ninety percent of C-SPAN's budget is derived from license fees (currently four cents per subscriber per month) paid by cable operators for the privilege of carrying C-SPAN.  In 1986, C-SPAN added C-SPAN II, to provide for continuous coverage of the Senate.

Despite the worries of some congressional traditionalists, C-SPAN has not altered Congress's conduct of business in a negative way. Each house has rules to avoid inequities in access to, or abuse of, its television coverage. "Playing to the cameras" has proven a false expectation. If anything, according to many reports, Congress's business on the floor is now handled more expeditiously, as representatives and senators craft their presentations to be succinct and to the point.

## Television Coverage in the States

In nearly 40 states, citizens can watch television coverage of their legislatures. California is not among these states. In most states, coverage of public affairs, including state issues, is included in the charter of state-supported public broadcasting stations. California, however, is the only state that provides no assistance to public broadcasting. The Legislature has no leverage by which it can persuade public broadcasters to cover state public affairs.

The many states offering coverage of their legislatures employ a wide variety of formats. Some use simple news shows to summarize, on a daily or weekly basis, developments in the legislature. Others are more ambitious and combine gavel-to-gavel coverage with additional coverage of key committee hearings (for example, those dealing with acknowledged controversies). Some states prepare "magazine-style" and documentary programming; others combine television coverage with other electronic media, including audio teleconferencing ("call-in's") and computer bulletin boards.

Similarly, states use different means for producing and distributing legislative programming. Most states (as noted above) delegate this responsibility to their state-funded public broadcasting stations.

v

very knowledge of about what is going into those bills. I think this is a technology that is long overdue on the Capitol.

CHAIRWOMAN MOORE: Mr. Frizzelle?

ASSEMBLYMAN NOLAN FRIZZELLE: I want to bring up a couple of different issues I want to ask a couple of questions of Mr. Olney.

CHAIRWOMAN MOORE: If you're going to go to that, then I will let Mr. Mallory have a response to Mr. Farr. I don't want to get into a long back-and-forth discussion.

MR. MALLORY: You're right. I sell coverage of the Capitol. But, the Legislature in this state does not publish a newspaper or a wire service. This is an area that should be unbiased way separate from the Legislature. The private sector should be seriously involved -- not a nonprofit corporation, but the private sector. That is my point.

CHAIRWOMAN MOORE: I could add something to that, but I won't, because we will get into a back-and-forth discussion. I will do it later and allow you a chance to respond. Mr. Frizzelle?

ASSEMBLYMAN FRIZZELLE: Mr. Olney referred to the potential for some kind of censorship, restriction, or narrowing of the agenda by the Legislature. There is a potential, of course, for censoring or narrowing the things that are put out by the broadcast media themselves. Depending on the bias or point of view of any element, you end up being exposed to one or another type of agenda. Some of us are concerned about the mechanism, who establishes the

18

parameters. I like the idea that Mr. Westen was mentioning, having an essentially independent outside organization deliver the things that seem more pertinent to the marketplace. It seems like a viable thing. I think C-SPAN follows that format and has been very successful at it.

But, I am wondering: we have a give-and-take legislature, quite a bit more so than the federal Congress. How much legislation might actually be formulated in order to create a specific TV image? Might legislation or the laws or the thrust of the laws be modified to some degree just by the nature of public exposure to them? There are some issues we have to negotiate quietly, because as soon as we negotiate publicly, there is a tendency to create an adversarial relationship between people, pro and con. In certain circumstances, some issues might better not be exposed, but who decides that? Maybe you can address some of those ticklish dilemmas, Mr. Olney.

MR. OLNEY: I think I may be in a an argument here that I may not be qualified to conduct. I have perhaps jumped the gun by suggesting that any specific proposal been made. I referring only to the summary I have seen of the report that Tracy prepared.

My only point with respect to control by the Legislature was that it would necessarily limit what viewers and voters would see. I wouldn't want such coverage to be seen as a substitute for journalistic coverage which is as you point out, certainly subject to the whims whatever journalist is doing the covering. In regard to

what Steve Mallory said, the kind of thing that is being talked about here is not necessarily incompatible with commercial broadcast news coverage. I hope it wouldn't be. As Sam Farr said, they really are quite different. I don't see why one couldn't coexist with the other. In fact, I would hope that if a "California Channel" was established, it would create more interest and cause stations like those I have worked for to provide more coverage in response to demand from viewers.

As to your question about whether deliberations should occur in public or private, it seems to me that that is the case now. It wouldn't be affected very much by technological change. I don't know to what extent the availability of television coverage now determines whether legislative proposals.

ASSEMBLYMAN FRIZZELLE: Generally, coverage is of floor sessions and only rarely of committees. Most of the pitched battles occur in committees. Oftentimes, things that are quite significant here are exposed in committees, unlike in Washington. Even though many bills get voted down and so forth, they may still have a kernel deserving of a public responses.

MR. OLNEY: I'm very well aware of that, having been a reporter here. It is one of the things we now miss, trying to cover from a distance. I think Steve Mallory's service is doing a good job in helping to fill that vacuum.

CHAIRWOMAN MOORE: Ms. Wright?

20

strongly suggest that you be very protective so as to make this independent. It should not be your decision if a C-SPAN crops up in California. You have problems in Washington with the House and the Senate covering the cameras, we would have that same problem here. You would have that same problem. I remember days in this Capitol when, if one member of the committee objected, we were thrown out.

CHAIRWOMAN MOORE: That is still the rule.

MR. BIONDI: You have to be very careful about the operation of your business, for example, negotiations on sensitive political matters: who makes the decisions on what goes out and who's covering it. I think you're talking about coverage of this Capitol at several different levels. I don't think the state ought to pay for it. I think it ought to evolve on its own, completely independent of you, because it is going to happen anyway.

CHAIRWOMAN MOORE: That ought to be made clear, we are not going to fund any organization to get it started. What we're really talking about in this era of reform, is that maybe there is a public need. People talk about sunshine, but how about a little sunshine on the issues and work that we do here? That's basically what we're talking about. Again, let me reemphasize, there has been no decision as to how this is going to be done or even if we are going to do it. What we're doing is exploring the possibilities.

MR. BIONDI: I think you're right to ask the question. You are right to ask the question and get people thinking about it.

27

CHAIRWOMAN MOORE: Ms. Killea?

ASSEMBLYWOMAN LUCY KILLEA: I think Mr. Frizzelle
raised an issue, whether or not television is going to be used for
grandstanding.

We did a straw-poll of the congressional offices in our
district. Three of the four are Republican offices.

Duncan Hunter's office thought it was great. It gives the
minority party a chance that they feel, because they are the minority
party, they don't always have in the committees, this is an
opportunity for them. They also have an opportunity after the
session to air their views. Duncan Hunter took advantage of an all-
night special order on the flag burning controversy, which kept
everybody up all night. According to his office, it doesn't affect the
nature of the debate. IMaybe people are dressed a little bit better.
Maybe they speak a little more carefully, but there seems to be no
difference in what people say.

Jim Bates, Democrat, thinks it is great. "It was
controversial when it started, but there are no complaints. Everyone
has adapted to it and likes it very much. The debate seems to be
more open and maybe a little bit more polished. People are watching
their language, but it really hasn't affected their assignments. In
fact, power isn't indicated by who speaks most eloquently on the
floor. Clearly it is the committee assignments, the work they do, the
bills they sponsor and so on and that doesn't change whether they
speak before the television cameras or not. That doesn't have the

28

effect of influencing it. " The other opinion we got was from Congressman Loury's office, another Republican.   They thought it was very positive.   "All the Members thought they were going to hate it, that it would turn into something that was very artificial and they would have to play to it, but is hasn't done that really."   They are getting used to the cameras, and they just go right on with business as usual.   No disadvantages they can think of.

Congressman Ron Packard's office, another Republican, thinks it is "wonderful," and "strongly encourages Sacramento to have hearings televised."   They feel explaining the working of Congress is very important for the people.   "It is really very educational."   They get a lot of mail about things that are happening on C-SPAN, asking questions, making comments, and getting input from it.

I don't know how many people you run into, but I run into an awful lot of people who don't know what the state government does.   They don't have the faintest idea of why we even have a state government.   I think that is something that requires a remedy.

CHAIRWOMAN MOORE:  Thank you for those comments.  I had the opportunity to talk to some members in Congress who once served in this house.   They have some concerns and felt perhaps it might not be such a good idea, for the reason that Assemblyman Frizzelle mentioned:   they felt that some people will grandstand, given the opportunity to be on television.   Again, I think, that would

depend on the kinds of coverage.  We are talking about a variety of different things.  In all fairness, both sides have to be heard.  I tried to get a couple of them to come to this hearing.  When we do this again, we may be able to get some of them  to tell us exactly where they stand.  Dr. O'Connor?

DR. O'CONNOR:  I have to go teach a class, so let me quickly add a couple of thoughts.

In the various generations of these proposals, which I will gladly supply to the Chairwoman if you don't have them in your files, alternative models that were explored.  It was interesting to hear about the early years of C-SPAN.  When you take something like Tracy's study and you try to implement it full-blown, it is overwhelming to everybody.  There are middle grounds that need not interfere with what Steve does or or with Vic Biondi's people.  There are alternate ways we can have television coverage of the Legislature and not compete with one another.

On the Educational Technology Committee that I chair, we know there is an overwhelming need in high school and junior high civic classes for gavel-to-gavel coverage.  They don't really care about edit programs.  They just want gavel-to-gavel coverage.  Gwen, Larry Stirling, and Bill Lockyer went up to Canada.  The CBC uses a lot of university interns.  You that you have the CSUS system at your disposal.  We run your fellowship programs for you at CSUS.  That is something that you could decide to do:  gavel-to-gavel coverage tied

ASSEMBLYMAN FARR:  How do you decide to coverage a committee?  I mean, take the network news.  If there is a hearing on flag burning, obviously that sexy issue is going to get coverage.  You may have previously committed to a hearing on some other subject.  As I understand it, once you make a commitment to cover a hearing, you cover the whole hearing.

MR. ALLEN:  Hearings are gavel-to-gavel.  The decision is made before the day of the committee hearing.  We can make changes up to a day before if we find something going on that is more important.  We have five remote crews, and there are a lot more than five committee hearings going on.

ASSEMBLYMAN FARR:  Do you make decide, "We think the network will cover this and we don't need to, so we can cover something else"?

MR. ALLEN:  No.  The networks won't be doing gavel-to-gavel for the most part.  Turner does on occasion, CNN does on occasion.  For the most part, you can't devote that many hours to it.  We make the decisions based on what we think our people want to see the most, that which is the most telling issue at the moment, and take it from beginning to end.

CHAIRWOMAN MOORE:  Ms. Roybal-Allard?

ASSEMBLYWOMAN LUCILLE ROYBAL-ALLARD:  We have been hearing quite a bit about the advantages of this type of coverage.  I think there is a lot of value and merit to what has been said.  But because we have to make a decision in this regard, I would

45

like to hear some of the problems and pitfalls that have occurred and that maybe still exist even now.  If we were to decide to go ahead, what it is we could do to mitigate or avoid some of those same pitfalls or problems?

CHAIRWOMAN MOORE:  Why don't you take a shot at that. Ed?

MR. ALLEN:  I can tell you two problems that C-SPAN has run into.  One is the use of "special orders" after the session is over.  Members, would get up and orate for hours even though nobody was in the audience.  It <u>looked</u> like somebody was in the audience.  Congressman Gonzales of Texas was the first to realize the power of special orders, but it didn't take Newt Gingrich long to figure it out.  (By the way, that is why we got television in the Senate.  They found that Congressman Gonzales of Texas had a higher national profile than Senator Robert Byrd did, because the House was the visible part of the legislature.)  That problem was corrected by Speaker Tip O'Niell, who instructed the House employees operating the cameras to pull the cameras back and pan the chamber. There was practically no one in the chamber.

The other problem we have run into, on occasion, is of the rules the Senate and the House.  No encumbent can use C-SPAN programming as a clip in a political commercial, but that doesn't apply to a challenger.  That has been a problem.  Some candidates will take an eight-second sound bite out of C-SPAN, which may be totally out of context, and run it as as political commercial against an

incumbent.  I think that goes to the rules of the House and the Senate.

PROFESSOR WESTEN:  I can add a couple of comments to that.  Our research into what all the other states have done, as well as other parliamentary systems, has revealed that, in the long run, very few negatives surface.  There are a lot of questions raised at the outset, but after the system gets up and running, the cameras and become part of the furniture.  People tend to forget about it.

When the Senate was trying to decide whether or not to put the system in, they put it in for a two-month trial period, and ran a study of its impact in 20 different areas.  I can't remember what they all were, but their conclusion was that in 19 of those areas there was no impact and no problem.  The only potential problem they saw was special orders,  people giving statements after the floor sessions, just for the cameras.  As I understand it, this Legislature does not have that procedure.  So presumably it would not be a problem.  In terms of grandstanding and the impact on procedure, that has not been a problem in any jurisdiction we have looked at.

The second question is control.  Massachusetts, for example, contracts with WGBH, the public television station, to come in and do the coverage.  But, the contract has ground rules.  Head and shoulder shots only.  It is carefully spelled out as to what the coverage can be.  Other states think head and shoulder shots produce uninteresting television and let the camera crews roam and do action shots and so forth.  The point is, each legislature needs to decide

47

what the ground rules are.   That is something over which you have complete control.

The third point is interest, generating programming that people interested in seeing.   States have tried a whole range of different formats:   newscast, roundtable discussions, documentaries, viewer call-ins, and so forth.   Polling our focus groups, we found a mixture is better than just gavel-to-gavel.

Finally, as Ed said, states and C-SPAN have adopted rules on the use of their coverage.   Paid commercials are prohibited.   I think there is only one instance that we know of, in which C-SPAN's coverage has ever been used in a political commercial.

ASSEMBLYWOMAN ROYBAL-ALLARD:  Legislatures had to change the way they operate.   In Congress, they have four microphones and you walk up to the microphones.   Right now, we just lift a mike from our desk.   Have there been changes in that?

PROFESSOR WESTEN:  No, we are not aware of changes. Some legislatures only focus the camera on a podium.   Others will focus a camera on an individual seat.   Maybe a photograph of the legislators pops up, so when you hear the voice, you see the photograph but you don't see the actual video image.   The point is, all possibilities are equally easy.

ASSEMBLYWOMAN ROYBAL-ALLARD:  These are considerations for all of us.

CHAIRWOMAN MOORE:  Right.

48

"California Channel," Tracy and his group and everyone around this table can do the rest in turning that into something public.

PROFESSOR WESTEN: That is our recommendation. The Legislature can benefit from an internal system internally. If cameras are in the various committee rooms and on the Floor, then anyone in their office can simply switch the dial on their television set and be able to monitor events throughout the entire building. Other legislatures in the other states and the Canadian Parliament have found that it is an enormous benefit to internal efficiency. Once those signals are available in-house, our proposal is to uplink by satellite and make them available to everyone -- to radio stations, people in rural areas who don't have cable but who have access to home satellite dishes, cable systems, public broadcast stations, commercial broadcast stations -- to everyone.

CHAIRWOMAN MOORE: For those of us who are chairs of committees, that is a little frightening, knowing how hard it is to get a quorum these days. People would be sitting up in their offices and we would never establish quorums in our committees.

PROFESSOR WESTEN: The first step that needs to be taken is an engineering study to examine what it would cost to put cable in the building. Part of that has already been done. Lighting is adequate in many rooms, so it is not a major expense. Second, the Legislature has to decide what options it wants. How many cameras? How many rooms wired? Where would they be and what are the

66

ground rules of coverage?    Those steps can be taken fairly quickly, so that you know what your options are.

CHAIRWOMAN MOORE:  Thank you.  Before we do any of that, the Legislature is must decide what it wishes to do.  From the recommendations we have heard today, the decisions to ulitize new technology for a more participatory government may be far easier for us to reach than some of the others.

I want to thank this panel.  We will probably be doing a follow-up hearing, because I would like to offer members of Congress and other officials who have served in this body the opportunity to testify.  This may be the first of several hearings we will hold around the state to see where we go from here.

Again, let me thank you for your testimony.  It has been very enlightening.  We will be in touch.  Thank you for your participation.


MEETING ADJOURNED