| | |
|---|---|
| 1 | BENBROOK LAW GROUP, PC |
| 2 | BRADLEY A. BENBROOK (SBN 177786)<br>STEPHEN M. DUVERNAY (SBN 250957) |
| 3 | 400 Capitol Mall, Suite 1610<br>Sacramento, CA  95814 |
| 4 | Telephone: (916) 447-4900<br>Facsimile:  (916) 447-4904 |
| 5 | brad@benbrooklawgroup.com<br>steve@benbrooklawgroup.com |
| 6 | EUGENE VOLOKH (SBN 194464) |
| 7 | UCLA School of Law<br>405 Hilgard Ave. |
| 8 | Los Angeles, CA  90095<br>Telephone: (310) 206-3926 |
| 9 | Facsimile: (310) 206-7010<br>volokh@law.ucla.edu |
| 10 | Attorneys for Plaintiffs |

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIREARMS POLICY COALITION SECOND AMENDMENT DEFENSE COMMITTEE; FIREARMS POLICY COALITION; KRIS KOENIG; STEPHEN CHOLLET; MICHAEL SCHWARTZ; and TIM DONNELLY,<br><br>Plaintiffs,<br><br>v.<br><br>KAMALA D. HARRIS, in her official capacity as Attorney General of California,<br><br>Defendant. | Case No.: 2:16-cv-01144-MCE-AC<br><br>**REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date: June 9, 2016<br>Time: 2:30 p.m.<br>Courtroom: 7<br>Judge: Morrison C. England, Jr.<br><br>Action filed May 26, 2016 |

# REPLY MEMORANDUM

## I. Plaintiffs Have Standing to Challenge Section 9026.5.

The State's standing argument is limited mostly to its suggestion that it may not enforce the law—an odd claim for a law that is supposedly necessary to serve a "compelling" state interest. The State acknowledges and then largely ignores that the Supreme Court applies a relaxed standing requirement in First Amendment cases. The Court has "endorsed what might be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences." *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003) (citation omitted). "Were it otherwise, free expression—of transcendent value to all society, and not merely to those exercising their rights—might be the loser." *Az. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) (citation omitted); *see ACLU of Nevada v. Heller*, 378 F.3d 979, 983–84 (9th Cir. 2004) (organization had standing to challenge statute that chilled members' political speech about state ballot initiatives).

Here, Plaintiffs have already suffered direct injury: They have refrained from engaging in political speech protected by the First Amendment. This is sufficient to confer standing. *See Az. Right to Life*, 320 F.3d at 1006 (finding standing where political committee "was forced to modify its speech and behavior to comply with [a] statute"). In *Arizona Right to Life*, the Ninth Circuit explained that in a First Amendment pre-enforcement case, "actual harm" flows from self-censorship and the deterrent effect of the statute. There, as here, "the alleged danger of [the speech-restricting statute] is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution." *Id.* (citation omitted). Indeed, it would "turn respect for the law on its head . . . to conclude that [Plaintiffs] lack[] standing to challenge the provision merely because [they] chose to comply with the statute and challenge its constitutionality, rather than to violate the law and await an enforcement action." *Id.* at 1007.

It is further sufficient for standing purposes that Plaintiffs have shown that they intend to engage in expression prohibited by Section 9025.6, or would do so but for the statute. Because Plaintiffs' intended speech falls within the Statute's prohibitions, they have alleged a "threat of potential enforcement" sufficient to confer standing. *Protectmarriage.com–Yes on 8 v. Bowen*,

752 F.3d 827, 839 (9th Cir. 2014); *Getman*, 328 F.3d at 1095 (explaining that self-censorship confers standing when a plaintiff's intended speech "arguably falls within the statute's reach").[1]

Thus, the State's argument that Plaintiffs lack standing because there is "no credible threat of adverse state action," Opp. at 6:20–8:10, does not hold water.  Plaintiffs do not need to be specifically threatened with prosecution before they have standing to sue.  "A plaintiff who mounts a pre-enforcement challenge to a statute that he claims violates his freedom of speech need not show that the authorities have threatened to prosecute him; *the threat is latent in the existence of the statute*." *Getman*, 328 F.3d at 1095 (quoting *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003)) (emphasis added); s*ee also Wolfson v. Brammer*, 616 F.3d 1045, 1059 (9th Cir. 2010) (citing *Getman* and explaining that "[i]n the context of First Amendment speech, a threat of enforcement may be inherent in the challenged statute.").  Put simply, "[e]specially where protected speech may be at stake, a plaintiff need not risk prosecution in order to challenge a statute." *Wolfson*, 616 F.3d at 1059–60; *see also id.* at 1060 ("The Supreme Court has repeatedly pointed out the necessity of allowing pre-enforcement challenges to avoid the chilling of speech.").

Finally, the State's decision to defend this law under the governing strict scrutiny test also undermines its standing argument.  If the State really believes that Section 9026.5 is "necessary" to serve a "compelling interest," it seems likely that the Attorney General—whose job it is to enforce California criminal laws—would not stand by idly while the law is being violated.

## II. Section 9026.5 Violates The First Amendment.

### A. Section 9026.5 Cannot Pass Strict Scrutiny.

The State, in essence, argues that there is a compelling interest in shielding legislators from criticism or commentary: "Section 9026.5 . . . serves a compelling interest in protecting the integrity of Assembly proceedings by ensuring that Assembly members are free to engage in legislation *without considering that video footage will be used to support or oppose them in political advertisements*." (Opp. at 1:17–20 (emphasis added).)  Yet there can be no such

---

[1] Accordingly, the State's argument that Plaintiffs Schwartz and Donnelly lack standing because "they have alleged no specific intent" to violate Section 9026.5, Opp. at 8:11–24, is likewise unpersuasive.  Both Plaintiffs have specifically alleged that they would like to use assembly video footage for political purposes but have not done so because of the statute.

compelling interest.  "Suppression of the right of the press to praise or criticize governmental agents and to clamor and contend for or against change" violates the most basic principles of the First Amendment.  *Mills v. Alabama*, 384 U.S. 214, 219 (1966).  "Criticism of government is at the very center of the constitutionally protected area of free discussion.  Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966).  And "[c]riticism of [government actors'] official conduct does not lose its constitutional protection merely because it is effective criticism and hence diminishes their official reputations." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 273 (1964).

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 351–53 (2010), confirms that this right extends to nonmedia organizations as much as to the "accredited news organization[s]" favored in Section 9026.5.  The Court has "consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers.  With the advent of the Internet and the decline of print and broadcast media . . . the line between the media and others who wish to comment on political and social issues becomes far more blurred."  558 U.S. at 352 (citations omitted).  Americans cannot be sent to jail for using speech—including speech that incorporates video—to "oppose [legislators] in political advertisements."

Government officials concerned about their peers mugging for the cameras, or avoiding politically unpopular comments for fear of the cameras, could choose not to televise proceedings in the first place.  Indeed, they could choose not to provide written transcripts, or (to the extent allowed by state law) hold more meetings entirely in private.  But once they publish video, audio, or text of their proceedings, they cannot then criminalize citizens' use of such content.  *Cf. Florida Star v. B.J.F.*, 491 U.S. 524 (1989) (while government can properly decline to release information, "once the truthful information was 'publicly revealed' or 'in the public domain," it "could not constitutionally restrain its dissemination" (citations and some internal quotation marks omitted)).[2]

---

[2]  *Florida Star* is one of several U.S. Supreme Court decisions holding that the First Amendment prohibits restrictions on republishing information that has been made publicly available, particularly when such information relates to "a matter of public significance."  *See Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491 (1975) (striking down an Oklahoma statute that made it a crime to republish the name of a rape victim obtained from public records); *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103 (1979) (striking down West Virginia statute making it a crime to

Many government officials doubtless would like to be "free to engage" in their duties "without considering" that publicly released information "will be used to . . . oppose them." (Opp. at 1:19–20.) And perhaps legislative debate might be more free and open if legislators knew they were shielded from certain kinds of video criticism; because of this concern, government bodies might sometimes decline to allow video recording at all.  But such a concern cannot justify content-based restrictions on the use of such information once it is publicly released.  The Supreme Court has explained that the government's determination to make information publicly available necessarily means that further dissemination serves the public interest:

> By placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served.  Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media.  The freedom of the press to publish that information [is] of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business.

*Cox Broad. Corp. v. Cohn*, 420 U.S. at 495.  Such is the case here: The Legislature has made the video feed available in the public domain; the public must be free to publish that information.

The State advances a few additional arguments that merit quick response.  The State claims that the statute is necessary to preserve "balance":  if Assembly members are prohibited from using the video feed for political purposes, according to this argument, so should their "political opponent[s]." (Opp. at 12.)  But this sort of "balancing" is not a legitimate governmental objective.  "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." *Buckley v. Valeo*, 424 U.S. 1, 48–49 (1976).

Nor is Section 9026.5 saved by its "exclud[ing] from its scope uses of the Assembly televised footage for non-political purposes." (Opp. at 13:2.)  Speech in pursuit of political purposes is not an unloved stepchild of the First Amendment, subject to restriction so long as speech in pursuit of supposedly nobler purposes is allowed.  Rather, political advocacy, including

publish the name of a juvenile charged with an offense after newspaper was indicted for publishing name it lawfully obtained by monitoring police radio transmissions); *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829 (1978) (striking down state statute that criminalized publication of the contents of confidential judicial proceedings).

about ballot measures, is "at the heart of the First Amendment's protection." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 776 (1978).

And Section 9026.5 is likewise not saved by its covering "only televised footage" and not "audio recordings or transcripts." (Opp. at 13:5–6.) Even when it comes to less-protected commercial speech, the Supreme Court has recognized that pictures are often worth more than words: "The use of illustrations or pictures . . . serves important communicative functions: it attracts the attention of the audience to the [speaker's] message, and it may also serve to impart information directly." *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 647 (1985) (striking down a restriction on lawyers' use of illustrations in advertisements).

Finally, the practical reality of how Section 9026.5 operates undermines the State's claim that the statute can withstand strict scrutiny. For one thing, the statute applies only to the Assembly, and not to the California State Senate, which has no similar statute prohibiting the use of its video feed. There is no indication that the State Senate has devolved into a boorish and unruly institution (as compared to the Assembly) since it began televising its proceedings. The State also claims that Section 9026.5 "has apparently never been enforced by any agency" since it was passed more than 25 years ago. (Opp. at 1:14.) If that is in fact true, the statute is not truly necessary to achieve the State's purported interest in preserving legislative integrity.

> **B.    Section 9026.5 Cannot Be Justified As A Means of Protecting Intellectual Property.**

The State also argues that Section 9026.5 bars "expopriat[ing]" "content created by the Assembly," apparently because "[p]laintiffs' use of these videos could implicate copyright infringement concerns." (Opp. at 9–10.) This argument is wrong for at least three reasons.

> **1.    The Copyright Act preempts state attempts to prevent copying and broadcasting of video recordings.**

The Copyright Act expressly preempts state-law "rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103." 17 U.S.C. § 301. "Audiovisual work[s]," such as

video recordings, are expressly protected by 17 U.S.C. § 102(a)(6). They are works of authorship fixed in a tangible medium of expression. 17 U.S.C. § 101. Copying and then broadcasting such videorecordings is within the general scope of the copyright reproduction and public performance rights. 17 U.S.C. §§ 106(1), (4). Any attempt to use a State law such as § 9026.5 to protect the State's (or others') supposed proprietary interests in such video recordings is thus preempted.

"Copyright preemption is both explicit and broad: 17 U.S.C. § 301(a) prohibits state-law protection for any right equivalent to those in the Copyright Act." *G.S. Rasmussen & Assocs. v. Kalitta Flying Serv.*, 958 F.2d 896, 904 (9th Cir. 1992). And it extends to criminal laws as well. *See, e.g.*, *Rosciszewski v. Arete Assocs., Inc.*, 1 F.3d 225 (4th Cir. 1993) (holding that the Virginia Computer Crimes Act, which outlawed certain kinds of copying of computer programs, was preempted because "the core of both causes of action, in the context of [plaintiff's] claim, is the unauthorized copying of a [Copyright-Act-protected] computer program."). Likewise, if Section 9026.5 protects against "expopriat[ing]" "content created by the Assembly" through "unauthorized copying" and broadcasting of a video recording, it too is preempted by § 301. *See United States ex rel. Berge v. Bd. of Trustees of Univ. of Ala.*, 104 F.3d 1453, 1464 (4th Cir. 1997) ("where the core of the state law theory of recovery . . . goes to wrongful copying, . . . it is preempted"); *Daboub v. Gibbons*, 42 F.3d 285, 289 (5th Cir. 1995) (likewise).

### 2. The First Amendment protects "fair use," but Section 9026.5—unlike copyright law—does not offer a fair use defense.

Even if, as the Attorney General argues, Section 9026.5 were permitted to act as a form of state copyright law (which it is not), the statute would violate the First Amendment because it lacks the Copyright Act's "fair use" defense. Much use of Assembly video for political commentary and criticism would be fair use under 17 U.S.C. § 107, which expressly lists "criticism" and "comment" as examples of purposes that may lead to a finding of fair use.

The Attorney General thus errs in stating that "there is no First Amendment right to use the copyrighted work of another, *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 556 (1985)." (Opp. at 10.) *Harper & Row* held only that there is no First Amendment right to *infringe* copyright, and it so held in large part because "of the First Amendment protections

already embodied in the Copyright Act's distinction between copyrightable expression and uncopyrightable facts and ideas, and *the latitude for* scholarship and *comment traditionally afforded by fair use*," *id.* at 560 (emphasis added).

Likewise, *Golan v. Holder*, 132 S. Ct. 873 (2012), upheld the challenged aspect of copyright law against First Amendment challenge based in part on the fact that the law "leaves undisturbed . . . the 'fair use' defense." *Id.* at 890–91. *Eldred v. Ashcroft*, 537 U.S. 186 (2003), held the same, while describing fair use as a "traditional First Amendment safeguard[]." *Id.* at 219. *See also A & M Records, Inc. v. Napster*, 239 F.3d 1004, 1028 (9th Cir. 2001) ("First Amendment concerns in copyright are allayed by the presence of the fair use doctrine.").

The closely analogous *City of Inglewood v. Teixeira*, 2015 WL 5025839, *6, *8, *12 (C.D. Cal. Aug. 20, 2015), confirms the broad First Amendment protection that fair use offers to citizens' use of government-created video recordings of government proceedings. There, the court expressly held that a citizen's copying of the video of city council meetings was "Fair Use as a Matter of Law." *Id.* at *12. Indeed, the court found the city's claim that the citizen's use infringed copyright to be so "meritless" and "unreasonable" that it awarded over $100,000 in attorney fees to the defendant, partly in the interest of "Deterrence of Future Frivolous Actions." *City of Inglewood v. Teixeira*, 2015 WL 6146269 (C.D. Cal. Oct. 8, 2015), at *4.

Yet Section 9026.5 purports to limit permitted use of the otherwise-forbidden video to two favored groups of speakers: "accredited news organizations" (which, presumably, the Assembly would "accredit[]") and nonprofits engaged in "educational or public affairs programming," with no fair use rights offered to any other speakers. Section 9026.5, even if seen as a means of protecting copyright, is thus unconstitutionally overbroad, because "a substantial number of its applications are unconstitutional judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010) (citation omitted). The statute would cover a substantial range of First-Amendment-protected fair uses, such as political commentary and criticism, by the plaintiffs here or by other citizens. And if the statute has any legitimate sweep at all, in light of § 301 preemption and the First Amendment, that sweep would be comparatively minor: Few people are really interested in, for instance, engaging in the sort of large-scale literal

copying for commercial purposes that might not qualify as a fair use.

### 3. California government works are generally not protected by copyright in any event.

State government works are also not protected by copyright unless the state expressly authorizes its government entities to make such claims. *Cnty. of Santa Clara v. Super. Ct.*, 170 Cal.App.4th 1301, 1331 (2009). In California, state government entities cannot own copyright in the absence of an "express authorization to secure copyrights." *Id.* at 1333; *see City of Inglewood v. Teixeira, supra* 2015 WL 5025839 at *6 (concluding, based on *County of Santa Clara*, that a city cannot own copyright in videorecordings of its city council meetings). Yet Section 9026.5 contains no such express authorization, and indeed never even mentions copyright. Nor does the Committee Hearing on which the state relies, Opp. Exh. 1, ever mention copyright.

### C. Section 9026.5 Cannot Be Justified As A "Commercial Speech" Regulation.

The State also asserts that, when FPC hires plaintiff Koenig and plaintiff Chollet to create videos, such "commercial purposes" on Koenig's and Chollet's part make their speech "commercial speech." (Opp. at 13–15.) But political advertisements do not become "commercial speech" simply because people are hired to make them.

Newspapers, books, and movies are all sold for money, and are created by people who are paid money; yet this does not make them "commercial speech." *See, e.g., Hoffman v. Capital Cities/ABC, Inc.*, 255 F. 3d 1180, 1184–86 (9th Cir. 2001) (fashion-related article in for-profit magazine was not commercial speech); *Mattel, Inc. v. MCA Records, Inc.*, 296 F. 3d 894, 906–07 (9th Cir. 2002) (song distributed for money is not commercial speech). "Some of our most valued forms of fully protected speech are uttered for a profit." *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 481 (1989) (citing, as examples, cases involving political ads for which money is paid). That someone—such as Koenig or Chollet—"has an economic motivation" for speech "would clearly be insufficient by itself to turn the materials into commercial speech." *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 67 (1983). "[W]hat defines commercial speech" is that the speech "*proposes* a commercial transaction," *Fox*, 492 U.S. at 481, not that some of the people who engage in the speech are motivated by profit.

### III. Section 9026.5 Cannot Be Defended On The Grounds That It Supposedly "Restrains Very Little Speech."

The State argues that, "even assuming that plaintiffs have made a technical legal showing of likelihood of harm, that harm carries minimal weight because Section 9026.5 restrains very little speech." (Opp. 15:15–16.)  Because Section 9026.5 restricts only the use of video recordings and not of audio recordings or transcripts, plaintiffs would supposedly "suffer no real harm, much less irreparable harm, if they were required to comply with Section 9026.5." (*Id.* at 15:21–22.)

But, as noted above, transcripts and audio are not adequate substitutes for video and images.  *See Zauderer*, 471 U.S. at 647.  And beyond that, the Ninth Circuit has found irreparable harm even when a speech restriction left speakers free to speak in other ways.  *See Klein v. City of San Clemente*, 684 F.3d 1196, 1207–08 (9th Cir. 2009) (restriction on placing leaflets on unoccupied cars irreparably harmed speakers, even though speakers remained free to speak using other media); *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 827–28 (9th Cir. 2013) (restriction on solicitation of employment on public streets irreparably harmed speakers, though speakers remained free to speak using other media).

The State claims further that an injunction would "compromise . . . the integrity of the legislative process."[3]  (Opp. at 16:13–15.)  To the contrary, the fundamental premise of the First Amendment is that promoting the free flow of information *enhances* the integrity of the electoral process, and thus of the legislative process as well: "Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people.  The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United*, 558 U.S. at 339 (citation omitted).  Section 9026.5 plainly restricts speech at the heart of the First Amendment.  The State "can derive no legally cognizable benefit from being permitted to further enforce an unconstitutional limit on political speech." *Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698

---

[3] The Attorney General also speculates that enjoining Section 9026.5 would lead the Assembly to cease televising its proceedings.  (Opp. at 16:15–16.)  There is little reason to believe that to be the case.  As noted above, the California Senate leaves citizens free to use its video programming, and there has been little call to abandon Senate video as a result.  In any event, whether to televise legislative proceedings is a decision left to the political process.

1  F.3d 741, 749 (9th Cir. 2012).

2  Underlying the State's argument is the idea that protecting members of the Assembly from criticism by "opponents" (or from each other, as in the case of the putative grandstanding legislator) can justify content-based speech restrictions, so long as the State believes that the speech is likely to be said by "politicians, profiteers, and propagandists." (Opp. at 9:9.) But this reach for alliteration obscures a disturbing, and utterly backwards, conception of "the People's business." (*Id.* at 9:8.) "[P]ublic men, are, as it were, public property." *N.Y. Times Co.*, 376 U.S. at 268 (citation omitted). Publishing a record of the People's business and then telling *some* of the People they cannot share that record with their fellow citizens is foreign to the conception of democracy that the First Amendment protects. The First Amendment ensures that "politicians, profiteers, and propagandists" have the right to comment on and criticize their representatives just as much as "accredited news organization[s]" do.

Finally, there is a tension between the State's balance-of-hardships argument and its statement that the law is not actively enforced. It is no harm to the State to be ordered not to enforce a law it claims it does not intend to enforce. It remains the case, however, that the very presence of Section 9026.5 continues to have a very real effect on Plaintiffs, who seek to engage in political speech that is criminalized by the statute.

*   *   *

On the merits, Section 9026.5 violates the First Amendment. It criminalizes fully protected speech based on its content, and cannot pass strict scrutiny. It cannot be justified as a means of preventing copyright infringement. And it irreparably harms plaintiffs, by denying them a powerful way of conveying their message in the months leading up to the November 2016 election. The motion for preliminary injunction should therefore be granted.

Dated: June 7, 2016                    BENBROOK LAW GROUP, PC

                                       By  /s Bradley A. Benbrook
                                           BRADLEY A. BENBROOK
                                           Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

Case No. 2:16-cv-01144-MCE-AC

I hereby certify that on June 7, 2016 I electronically filed the following document with the Clerk of the Court for the United States Eastern District of California by using the CM/ECF system:

**REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Kelly Rosenbery